May it please the Court, my name is Stephanie Adraktis and I represent Thomas Scott. Crawford v. Washington generally bars the use of testimonial hearsay at trial, and it also clearly holds that testimonial hearsay includes pre-trial statements that the declarant would reasonably expect to be used at trial. In this case, the hearsay that was admitted, the only purpose of those statements was to present evidence at Scott's trial, evidence to convict him of the crime of possession of cocaine. At trial, the witness who did testify as a surrogate did not testify to his own conclusions based on underlying data produced by another. Instead, he testified to the hearsay conclusions of another witness in direct violation of the ruling Crawford. This Court's recent decisions in Flournoy v. Small and Maris v. Sisto are distinguishable because they deal with hearsay statements that are either not testimonial or are not hearsay. And I would refer the Court to the Supreme Court's very recent decision in Williams v. Illinois of June 2012, which postdates those two Ninth Circuit cases. They alter the analysis somewhat with respect to Flournoy and Maris because they deal all three cases with DNA analysis, and as the Williams Court explained, that type of analysis is functionally different. And in the opinion, they do distinguish it in ways that are important to the State. Ginsburg. Counsel, do we even get there? Because the last recent decision of the State courts was in 2006, so don't we have to be kind of constrained to just look at what was well-established then, and that was Crawford, and Crawford had not defined testimonial? Your Honor, for purposes of the kind of testimony that was given in this case, I would submit that Crawford did define testimonial hearsay, statements of a declarant that were designed to be used for evidence at trial. That's exactly what we have here, and Crawford was very clear that it was concerned not only with that type of testimony, but specifically with testimony by government witnesses prepared with an eye toward trial, exactly what we have in this case. The subsequent cases, which were cited by opposing counsel as well, Maris and Flournoy, do deal with the troubling issues surrounding admission of technical forensic evidence at trial, and the Supreme Court has since conceitedly addressed those issues with more specificity. But I would submit to the Court that those cases are not, don't require, how can I say this, Scott need not rely on those subsequent cases to prevail in this case because Crawford directly addresses the kind of testimony we have here. But you're defining the kind of testimony as something prepared for trial, and that was certainly true of the lab reports in Melendez-Diaz and Bocoming and others. Exactly, Your Honor. However, in those cases, the reports themselves in Melendez-Diaz were admitted. Here we don't have that. We have a live witness who is telling the jury another person said that this substance was cocaine. So we didn't have a paper business record, which is what Melendez-Diaz was discussing, that was offered to the jury as evidence under that hearsay. Well, your distinction then is not whether it was prepared for trial. It's whether it was sort of a second-level hearsay or something like that. Your Honor, I would suggest it's not my distinction so much as it was an effort by the government to carve out an exception to Crawford. That's what those cases represent. Melendez-Diaz and Bocoming were both situations where the government was making an argument, similar to what was made in Williams, that it's too burdensome for the government to bring in a live witness every time they want to put on forensic conclusions so that they felt they should be allowed to present the testimony that way despite Crawford, even though Crawford had clearly said that that was not allowed under the Constitution. So our point here is that the general rule, the rule that applies in this case, is the Crawford rule, that there were not exceptions created in Bocoming or in the testimony that was given in this case, and that Williams shows us even further that Crawford does not count as that kind of an exception. The Supreme Court in Williams talked about the fact that the DNA analysis in that case wasn't admitted necessarily to inculpate somebody. It was DNA analysis excludes people, and so it's not necessarily inculpatory. That's precisely the opposite of the situation we have here. The only reason, not only the primary purpose, but the only purpose that this evidence was produced by the government was to convict Mr. Scott. The only question that was asked of the analyst was, does this contain controlled substances? And there were issues that he could have explored on cross-examination if the actual analyst had testified at the trial. If you look at the transcript of Mr. Wallace's testimony, he said that the actual analyst had not been doing this kind of analysis his entire time at the crime laboratory. It looked like he had worked there about 14 years, starting in 1988. He had only done chemical analysis the last year and a half to two years. He was not certificated in chemical analysis. And the first screening or the cobalt test that he did to identify the substance as cocaine was negative. And I acknowledge that the subsequent tests were positive for cocaine, but Mr. Scott wasn't able to explore an anomaly in the analysis because the witness who did the analysis wasn't there. And in Williams, the Supreme Court talked about the fact that it's not workable for the government to put on every person who does every step of a DNA analysis. And so some hearsay can come in as an assumption or foundational. That wasn't required at all in this case. Mr. Wallace said that the work that was done by Reynolds only took about a half an hour. It was all done by one person. He could have done it himself, but no one asked him to do it. And so we don't have the same kinds of concerns. Moreover, the information that Mr. Wallace relied on when he read the report wasn't an assumption or a foundational set of facts. He was asked directly, what did Mr. Reynolds identify this as? Mr. Reynolds identified this as cocaine. So we didn't have a situation where this could have arguably been non-testimonial. The California Court of Appeals' reasoning on that point was directly contrary to Crawford. They said, well, Mr. Reynolds did this kind of work all the time. It was part of his duty. But if one reads Crawford, the Court said clearly that's exactly the kind of statement that we're concerned about here. So the California Court of Appeals' opinion was that it was an unreasonable application of Crawford, which did control at the time of Mr. Scott's appeal. With the Court's permission, I would like to address the ineffective assistance of counsel claim, if the Court would give me the opportunity. Kennedy. You've got about two minutes left, but we'll give you two minutes for rebuttal anyway, if you could. If you take those two minutes, then. Thank you, Your Honor. I'd like to point out that the California Court of Appeals affirmed Mr. Scott's conviction on the robbery count despite the trial counsel's failure to call two crucial witnesses. One of the facts they pointed to was they said, well, Mr. Scott had $69 in $1 bills, and he wouldn't have had that kind of money unless he got it from a robbery. But if you look at Reporters' Transcript 168 and also excerpts of Record 244, the plaintiff told a police officer, Officer LaVue, that only 15 $1 bills were taken during the robbery. So the California Court of Appeals' opinion on that point is objectively unreasonable, factually and logically, because having 69 $1 bills just doesn't prove that you just took 15 from a cash drawer. The other problem with the Court of Appeals' analysis on the identification was they said, well, they found this beanie and this gun, and it was in his path of travel. That vague description, path of travel, if you look closely at the transcripts, the gun and the beanie were both found on an asphalt parking lot. And the path of travel that Mr. Scott took after he left the car was across a dirt field. And so what appears from the transcript, an officer describes the items as being found 50 to 60 yards away from where the car was. It appears that those items were ditched by somebody close to where the liquor store was, not where Mr. Scott was when he was arrested. They could have come from the liquor store. Kennedy. How far were those items from the liquor store when they were found? The officers didn't describe the distance from the liquor store. They did say they were 50 to 60 yards from Mr. Scott. And there was a description of the arrest site being about a football field length from the liquor store. But there's been a car chase in the meantime, hasn't there? A 1,500-foot car chase, Your Honor. That's what the record says. Testimony of Officer Forbes. 1,500 feet. It's the shortest car chase that one can imagine. I mean, he basically kind of ditched the car very soon after the officers found him. So the distances are odd in this case. And what I'm suggesting here is that the discovery of those items doesn't connect Mr. Scott to the robbery. All we had to rely on, really, is the money, which I've already discussed, doesn't tie him to the robbery. And then we have the victim saying that's not him right after the incident. Under those circumstances, the defense counsel should have called those two witnesses to corroborate where Mr. Scott got the cash that he had, and also the other witness who, like the victim, said that doesn't look like the guy who was in the store who did the robbery. The identification was a crucial issue in the robbery count. And for those reasons, Mr. Scott should get a new trial. Thank you. Good morning, Your Honors. Deputy Attorney General Jennifer Jadavitz for Respondent. In regards to the first issue, the Confrontation Clause issue, it remains Respondent's position that clearly, in this case, the Court of Appeals' decision regarding the applicability of Crawford and whether the testimony was properly admitted, Crawford clearly did not establish that lab reports were testimonial. We would disagree with opposing counsel's analysis of Crawford in this case. And because Crawford was the only applicable Supreme Court authority at that time and as opposed to Williams, then, since that case is controlling, the Court's opinion was not unreasonable. And in this case, in a similar situation, as this Court has pointed out in Flores v. Maris, because Crawford was not clearly established that reports and testimony such as this was testimonial, then we would stand on the papers on that. We don't really have a report here. We have testimony about what a finding was by somebody else. Correct, Your Honor. And in this case, as this Court pointed out, though, in Flores v. Noy, that even the report was not admitted in this case. That's true. But the contents in the lab report for Crawford, it is the people's position, was not deemed testimonial at that time. Therefore, we would argue that the court of appeals rationale under Crawford was proper. Counsel, identity was a key issue in this case. How could it possibly have been a tactical decision not to call an objective bystander witness who said it wasn't the defendant? Assuming that you're talking about Mr. Fields in this case. I'm talking about Mr. Fields. It's the people's position that trial counsel explained, and I believe on the record what he said, the trial tactics obviously of which witnesses to call are clearly within trial counsel's province. I'm saying how could this be? I realize that the counselor was a pseudo evidentiary hearing, and the counsel said that it was a tactical decision, but he didn't explain what that tactical decision was. He just used that label. And I'm asking you to explain how it could be tactical when the victim couldn't identify the robber. No one else could identify for sure that Scott was the robber, and you had a witness who was unrelated in any way offering objective testimony that it wasn't him. Respectfully, Your Honor, I would disagree with the record indicates that he actually did explain his reasoning as to why he didn't call him, and I believe it would be Appellant's Excerpts of Record, Volume 2, which is page 176. I'm sorry, I don't have the exact RT site. When he explained it was just a trial tactic on his part because it didn't go to any issues in the case. In other words, what the trial counsel decided at that point is my point is that the key issue in the case was identity. Because, and I think the reason his rationale was is because the fact that he wasn't able to pick, excuse me, Mr. Scott out of a photo lineup did not necessarily constitute exculpatory information in this case because he wasn't at. He also told the police at the time that that wasn't him. But he also told the police that he wasn't at the liquor store, so he couldn't see him clearly. He only got a side view. He was 20 feet away. So, and he also gave a physical description based on the clothing that he was wearing that actually would have bolstered the victim's testimony in this case. So what we have here is a situation in which this would have, the fact that he wasn't able to pick him out of the photo lineup would have, just as the victim was unable to, merely would have been cumulative in this case and had no, you know, bearing. Well, it's hardly cumulative to say that one person who saw him said he couldn't identify him as a person. And the second person, who had no relationship to the first, also made that same statement that he couldn't identify him. Someone who was even in a less tenuous position to identify him. Yeah, but I would hardly say it's cumulative. You might say that it's not worth a lot. That might be arguable. But to say that if two people, I mean, let's suppose the first person said, no, it's not, wasn't him. You would say that there's no point in bringing in the second person who also said he was not the one? I think the point being, and I understand your point, Your Honor, that cumulative might have been a misstatement. But the fact of the matter is, is the jury in this case rejected the victim's inability to ID him through a photo. So there's no reason to believe in this case that they would not have also rejected someone who was in a nice. But you're saying it's harmless, is what you're saying. Well, I first think it's non-deficient to call this person in the first place on trial counsel's part. But in connection to all the evidence and the fact that he would have bolstered the victim's testimony as to what Mr. Scott was wearing on that night, that would make it non-prejudicial. Okay. Well, that's a different kind of an argument than from the fact that there's no purpose to it. Your argument is that the counsel said that he didn't do it because. He had a tactical decision. And I believe. Did he explain the tactical decision? He did. He said that he didn't think it went to any of the issues. And I also. Well, that's not the same thing to say he didn't think it went to the issues. I don't know what that means. That identity is not an issue? Well, no. The identity was an issue. But what he said was. And he was asked to look at. And this is Mr. Brown, trial counsel, talking about Mr. Fields. And what he had known about Mr. Fields is he was asked to look at a six-pack concerning a person that wasn't in the liquor store but at a parking area. So there may have been some confusion as to where this person was, although he did tell the police officers, Mr. Fields, that he saw someone wearing the same type of clothing, the dark clothing, the dark beading cap, the dark shirt, enter the liquor store. That would have matched the victim's description of the victim in this case, and thus bolstering his physical description, at the very least, of the perpetrator in this case. And I also. But the victim couldn't identify him either. Exactly. And which makes it non-prejudicial because the jury rejected the fact that the victim, who was in a much better position, perhaps, to get a clearer view of the perpetrator, rejected the fact regarding the facial identification. And with respect to the further explanation in the RT, and I believe it's around 486 to 487, in explaining why he didn't call Mr. Fields, he also said that had he called him, and we have to presume that this is all that would have happened because this is all we have in the record, all he would have questioned him on is were you shown a photographic six-pack? And presumably the answer would have been yes. And who did you pick out? And he said, that's all I would have asked. And that surely could not have demonstrated that this victim's, excuse me, this proffered witness's testimony would have been exculpatory in this case. Well, didn't, in fact, when he saw the six-pack, he picked out someone else as the perpetrator? I believe that's correct, Your Honor. But the fact of the matter is that that goes back to the argument that even the victim in this case was not able to positively identify someone from the photograph, but they both came up with the same physical clothing descriptions. And once again, Mr. Fields' testimony as to that would have bolstered the victim's testimony, identifying at least the physical clothing description of the perpetrator in this case. I suppose there's a little difference. The victim said, that's not him, but didn't identify anybody else. Mr. Field said, that's him, but it wasn't the defendant. In other words, he actually pointed to somebody in the line-up layout and said, that's him, which is a little different from what the victim did. And that's true, Your Honor, and that would have been something that would have been left up to the jury to decide. And once again, we're back to the situation that in this case, the jury was able to weigh all the evidence, and even without a positive identification from the witness, they still found him guilty, which brings us back to the point that there could have been no prejudice in this case. Unless the Court has any questions in this matter, the people would ask that the Court of Appeals rejection of these claims was reasonable, and we'd be willing to submit. Thank you, counsel. I'd like to briefly address the distinctions between Mr. Field's testimony and the robbery victim's testimony that made Field's testimony important. One of them was that the victim said that during the incident, the robber had pushed a bandana up over the lower part of his face as he was entering the store, and the victim also said that he was staring, understandably, at the gun when the gun was pointed at him. Mr. Field, by contrast, did not describe the person he saw as having a bandana over his face. And if you merge that with the victim's testimony, it's consistent that as he walked into the store, he put it on. So Field, unlike the victim, was able to see the robber's full face. The second important reason to call Field is that Field said that the jacket was dark. And you can see that in the police reports and in the description that Field gave. Mr. Scott's jacket was red on the bottom. It had red pockets and a red bottom portion. It was a two-tone jacket. Mr. Field would have corroborated the victim's statement that he didn't see any red on the jacket. The prosecutor tried to explain that away at trial by suggesting, well, the victim couldn't see all that red part of Mr. Scott's jacket because the robber was standing behind a counter. But that wasn't true of Mr. Field. Mr. Field, from 20 feet away, was able to see the robber's whole body and never said that he saw any red on the jacket. So that would have been consistent with Mr. Scott's identity defense, and it would have corroborated that the victim did, in fact, see the jacket and that he did describe it accurately. And I would submit, as well, it's been stated that, well, the victim was unable to identify Mr. Scott. But he did say that's not him, and he had reasons for saying that's not him. He said the robber didn't have facial hair, and Mr. Scott had a goatee and a mustache. And he said the clothes didn't look the same. And he was looking at the guy very shortly after this robbery happened. So Field's testimony was important to corroborate that the victim said that's not him and that it really wasn't him. There were other inconsistencies. The victim initially described the person as being Hispanic. Mr. Scott's African-American. He described a person 19 to 22 years old. Mr. Scott was 31 at the time. There was a 20-pound difference between the weight estimate. He described him as being about 140. Mr. Scott's 162. So we have a situation here where it was close on the issue of that identity. And the trial counsel's explanation, oh, this was just tactical, just doesn't make any sense. At some point during the hearing, he said something like, well, you know, he only saw someone in the parking lot. But that's not true. And Mr. Scott even pointed that out during the hearing. Did counsel offer any reason as to why the testimony of the witness he didn't call could have been harmful? I don't understand how it could have been harmful, Your Honor, when you look at the whole thing.  But did counsel say it would have been harmful? There was not any statement by him at the hearing for a motion for a new trial where he said, oh, this would have hurt me. I think that was something that came up in the appellate court's analysis, saying, well, it would have corroborated the view of the jacket. But counsel didn't say that at the hearing. He didn't say that's why. And when you look at all the circumstances, there were several police officers who saw what Mr. Scott was wearing that night. So really it wasn't at issue what Mr. Scott was wearing that night. What was the evidence? I mean, opposing counsel argues that it was harmless. What was the overwhelming evidence of guilt? Your Honor, there's – I'm sorry. There simply isn't overwhelming evidence of guilt here. We have very serious inconsistencies between the victim's description of Mr. Scott and his actual appearance. We don't have any indication that the items that were found in the asphalt parking lot were actually possessed by Mr. Scott. There were, in addition to the victim's very plain statement, that's not him, that's grounds in and of itself to acquit this man. And so any evidence that would have corroborated that statement would have been enough for an acquittal for at least one juror to have found a reasonable doubt on the identity in this case. There just simply wasn't any evidence directly tying Mr. Scott to the robbery in the $69,1 bills I've already discussed. That didn't tie him to this cash drawer because only 15 were taken from there. And, yeah, it's an unusual amount of $1 bills, but that doesn't mean anything. And the court of appeal did hang some of its analysis on that fact. Well, there seems to be some discrepancy on the quantity of money, because didn't the court of appeal's decision say that it was $450? That's how much Mr. Scott had. Okay. And the amount that was taken in the robbery is at excerpts of record 244, which was about $175. And initially the victim gave a specific accounting of each type of bill and how many. So Mr. Scott had quite a bit more than that. And that was a reason to call Mr. Scott's father as a witness. He should have been called to testify. Yes, he gave Mr. Scott additional cash. But at the end of the day, the prosecutor really hung her hat on the money, saying this establishes he's the robber, he's got all this cash on him, and he's in the area. But the Mr. Douglas Scott, the father's testimony, would have established the source of those funds. Couldn't have come from the cash drawer in any of that, all of it. Thank you, counsel. Thank you. Thank you.
judges: Canby, Reinhardt, Wardlaw